# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CYRUS HODES, | |
| Plaintiff, | |
| v. | C.A. No. 2024-0015-JTL |
| MOHAMMAD EMAD MOSTAQUE, and STABILITY AI, INC. a Delaware Corporation, | |
| Defendants. | |

## OPINION ADDRESSING SPOUSAL COMMUNICATIONS PRIVILEGE

Date Submitted: May 19, 2026
Date Decided: June 15, 2026

Raymond J. DiCamillo, Kelly E. Farnan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Avi Weitzman, Jennifer Conn, Sripriya Narasimhan, Jackson Herndon, Sarah Kim, PAUL HASTINGS LLP, New York, New York; *Attorneys for Plaintiff.*

E. Wade Houston, Joshua D. Courtney, Chen Wang, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Defendant Mohammad Emad Mostaque.*

**LASTER, V.C.**

Mohammad Emad Mostaque, a former hedge fund manager, and Cyrus Hodes, a globally recognized thought leader in the artificial intelligence space, co-founded an artificial intelligence company. They agreed that Mostaque would lead the day-to-day operations and Hodes would use his global business connections to promote the firm.

After a year and a half, Hodes feared the business would never get off the ground and that Mostaque had engaged in questionable behavior. He approached Mostaque about leaving the company, and they agreed that the company could buy Hodes' shares. But in two transactions that took place seven months apart, Mostaque himself purchased all of Hodes' 1,000,000 shares for a grand total of $100.

Meanwhile, behind the scenes, Mostaque had been developing an AI-powered technology. A few months after the repurchase, the company raised $101 million at a $1 billion valuation.

This litigation ensued. During discovery, Mostaque invoked the spousal privilege over text strings with his wife, who served as the company's head of public relations and chief operating officer. Hodes moved to compel production. This decision grants that motion as to one text string and denies it as to the others.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the motion to compel.[1] Given the procedural posture, this decision does not make formal

---

[1] Citations in the form of "PX ___ at ___" refer to exhibits the plaintiff filed in support of its motion. Dkts. 147, 167. Citations in the form "DX ___ at ___" refer to exhibits the defendant filed with its opposition to the motion. Dkt. 163. Page references cite internal pagination.

findings of fact. Instead, the following summary reflects how the record appears at this stage of the proceedings for purposes of the discovery ruling.

## A. The Formation Of The Company

Hodes and Mostaque met in early 2019 at the World Governance Summit. Later that year, they began developing a business plan for an artificial intelligence company.

In October 2020, Hodes, Mostaque, and a third co-founder incorporated Stability AI, Inc. (the "Company") as a Delaware corporation. Mostaque received 70% of the equity. Hodes and the third co-founder received 15% each. They agreed that Hodes would use his professional connections to promote the Company and secure strategic partnerships while Mostaque ran the business as CEO.

Zehra Qureshi, Mostaque's wife, also worked at the Company. Between 2020 and 2023, she officially held the title of Head of Public Relations and Luxury Brands. She described herself internally and externally as the Chief Operating Officer. She was also a director.[2]

Mostaque and Qureshi regularly talked about business. They often communicated by text and email using their personal devices. Their communications contain a mix of business and personal topics.[3]

---

[2] *See* PX 6 at 12.

[3] *See, e.g.*, PX 7.

**B.      Hodes Decides To Leave.**

For a year and a half, Hodes worked full time to help build the Company. He invested some of his own money and contributed to the success of one of the Company's first projects.

Hodes alleges that although he worked diligently, Mostaque allegedly did not. Hodes claims Mostaque was repeatedly absent from work, missed key deadlines without explanation, and used Company funds for personal expenses.

Hodes grew increasingly frustrated with Mostaque and decided to leave the Company. Hodes believed that the Company was essentially worthless and would likely be wound down due to Mostaque's poor leadership.

In mid-July 2021, Hodes approached Mostaque about exiting. Mostaque and Hodes agreed that the Company would buy Hodes' shares.

Instead, Mostaque bought them personally. The repurchase took place in two transactions. In October 2021, Mostaque bought 800,000 shares from Hodes for a total of $80. In May 2022, Mostaque bought the remaining 200,000 shares for $20. In total, Mostaque paid $100 for 1 million shares, reflecting a price of one ten-thousandth of a cent per share. Hodes earned no return on his investment, even after putting substantial time and additional capital into the Company.

**C.      Mostaque's Alleged Misrepresentations**

Hodes alleges that a week before the October 2021 repurchase, Mostaque told him that the Company was going to pivot to work on climate change. Hodes now

3

believes that statement was false. He claims that Mostaque had secretly decided to focus on developing text-to-image software using generative AI, had been working on the technology for over a year using Company resources, and expected that the technology would be valuable.

Hodes alleges that before the May 2022 repurchase, Mostaque told Hodes that the Company planned to support a grassroots, nonprofit research company that was working on artificial intelligence issues. To Hodes, that meant the Company would be moving in a direction that did not contemplate meaningful profits. Hodes now believes that Mostaque's statement was false. He claims that before that conversation, Mostaque had made significant progress on the text-to-image technology and had entered into a multimillion-dollar contract with Amazon Web Services to secure sufficient computing power to operate the technology. He also believes that Mostaque had created projections that envisioned $100 to $200 million in profits and had pitched the technology to investors in April 2022 at a $100 million valuation.

In August 2022, three months after the repurchase, the Company raised $101 million from venture capital firms at a valuation of $1 billion. The valuation hinged on the text-to-image technology.

### D.    This Litigation

In January 2024, Hodes filed this action. He asserted claims for fraud (Count I), negligent misrepresentation (Count II), breach of fiduciary duty (Count III), unjust

4

enrichment (Count IV), and quantum meruit (Count V). Mostaque and the Company moved to dismiss all of the counts under Rule 12(b)(6).[4] The court granted the motion to dismiss as to Counts IV and V, but otherwise denied it.[5]

After that ruling, the parties engaged in discovery. In July 2025, the Company produced over 47,000 documents. In December, Mostaque sought to claw back seventeen text strings on the basis of spousal privilege. Hodes disputed the claw back, and the parties reached an agreement on redactions for most of the text strings. Five remain in dispute. In April 2026, Hodes moved to compel production of the remaining text strings.

## II.    LEGAL ANALYSIS

Court of Chancery Rule 26(b) governs the scope of discovery. Under Rule 26(b)(1):

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, including the existence, description, nature, custody, condition and location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter.

Mostaque argues that he can withhold information because discovery only extends to "non-privileged matter." He relies on the spousal privilege.

---

[4] The court granted Stability AI Ltd.'s motion for dismissal under Rule 12(b)(2).

[5] *See* Transcript of September 11, 2024 Oral Argument on Defendants' Motion to Dismiss. Dkt. 39.

## A.        The Scope Of The Spousal Privilege

The common law recognizes two marriage-related privileges. One protects one spouse from being compelled to testify adversely against the other in a criminal proceeding (the "Adverse Testimony Privilege").[6] The other protects spouses in criminal or civil actions from having to testify about confidential communications during the marriage (the "Spousal Communications Privilege").[7]

Delaware Rule of Evidence 504 combines both common law privileges into a single framework labeled the "Spousal Privilege." Rule 504(c) states: "**General Rule of Privilege.** An individual has a privilege to refuse to testify and to prevent the individual's spouse from testifying as to any confidential communication between the individual and the spouse during the marriage."[8] The rule defines "spouse" as a "present or former spouse" and "confidential communication" as "a communication

---

[6] *See* Emily Crawford Sheffield, Note, *Rationalizing a Spousal Confidential Communications Privilege Fit for the Twenty-First Century*, 74 Vand. L. Rev. En Banc 187, 192–93 (2021) (describing Adverse Testimonial Privilege); Amanda H. Frost, *Updating the Marital Privileges: A Witness-Centered Rationale*, 14 Wisc. Women's L. J. 1, 12–15 (1999) (same); *Developments in the Law—Privileged Communications* [*hereinafter Developments*], 98 Harv. L. Rev. 1450, 1567–71 (1985) (same); Stewart Repalje, *The Competency, as Witness, of Husband and Wife*, 25 Am. L. Reg. 353 (1886) (same).

[7] *See* Sheffield, *supra*, at 193–97 (describing Spousal Communications Privilege); Frost, *supra*, at 9–12 (same); *Developments, supra*, at 1574 (same).

[8] Del. R. Evid. 504(c).

that an individual made privately to the individual's spouse that was not intended for disclosure to any other person."[9]

Delaware Rule of Evidence 504 thus recognizes a single "Spousal Privilege," but that singular privilege encompasses both the Adverse Testimony Privilege and the Spousal Communications Privilege. Mostaque invokes the Spousal Communications Privilege.

The Spousal Communications Privilege differs from other privileges that the Delaware Rules of Evidence recognize. The attorney-client privilege,[10] the physician-patient privilege,[11] the religious privilege,[12] the political vote privilege,[13] the trade-secret privilege,[14] and the informer's identity privilege[15] all speak in terms of a

---

[9] Del. R. Ev. 504(a)(1)–(2).

[10] Del. R. Ev. 502(b) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications . . . .").

[11] Del. R. Ev. 503(b) ("A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications . . . .").

[12] Del. R. Ev. 505(b) ("An individual has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication . . . .").

[13] Del. R. Ev. 506(a) ("Every person has a privilege to refuse to disclose how the individual voted during a political election conducted by secret ballot.").

[14] Del. R. Ev. 507(a) ("A person has a privilege to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person.").

[15] Del. R. Rev. 509 ("The United States or a state or subdivision thereof has a privilege to refuse to disclose the identity of a person . . . .").

7

privilege not to disclose information. Only the Spousal Communications Privilege speaks in terms of a privilege "to refuse to testify and to prevent the individual's spouse from testifying."

A privilege against disclosing information logically extends to the production of documents and electronically stored information that could result in disclosure. A privilege against testifying does not self-evidently extend beyond testifying.

The parties have briefed the motion on the assumption that the Spousal Communications Privilege applies not only to testimony but also to the production of documents and electronically stored information. That is understandable, and the law could hardly be otherwise. When spouses communicate frequently in written form, producing those materials can be equally if not more intrusive than testifying.

Just as Rule 504 could be clearer about the Spousal Communications Privilege's application to discovery, it likewise could be clearer in its application to spousal communications. All of the privileges recognized in the Delaware Rules of Evidence have at least three requirements. First, an individual must have communicated in a protected capacity (the "Capacity Requirement"). Second, the communication must further or sufficiently relate to a protected relationship (the "Relationship Requirement"). Third, the communication must have been made confidentially and remain confidential (the "Confidentiality Requirement"). Some privileges have more requirements, but those three apply universally across the privileges that the Delaware Rules of Evidence recognize.

8

Take the attorney-client privilege under Rule 502. To meet the Capacity Requirement, the individual must be a "client."[16] To meet the Relationship Requirement, the communication must be "made for the purpose of facilitating the rendition of professional legal services to the client."[17] To meet the Confidentiality Requirement, the communication must both be "confidential"[18] and have taken place between one of five enumerated combinations of persons.[19] As a result, "the attorney-client privilege is properly invoked when 'the attorney is acting as lawyer giving advice with respect to the legal implications of a proposed course of conduct.'"[20] The privilege does not apply when an attorney acts in a non-attorney role, like a business agent.[21]

---

[16] Del. R. Evid. 502(a)(1) & (b).

[17] Del. R. Evid. 502(b).

[18] Del. R. Evid. 502(a)(2).

[19] Del. R. Evid. 502(b).

[20] *Rembrandt Tech., L.P. v. Harris Corp.*, 2009 WL 402332, at *6 (Del. Super. Feb. 12, 2009) (quoting *Hercules v. Exxon Corp.,* 434 F. Supp. 136, 147 (D. Del. 1977)); *see also id.* (explaining that "counsel must 'infuse' the communication with legal advice" (citing *In re Ford Motor Co.*, 110 F.3d 954, 966 (3d Cir. 1997)).

[21] *See Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *14 (Del. Ch. June 30, 2023) ("The attorney-client privilege protects legal advice, as opposed to business or personal advice" (quotations and citation omitted)); *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 300150, at *5 (Del. Ch. Jan. 18, 2023) ("Privilege does not apply to an attorney who is acting as a business agent of a party." (citing *Int'l Paper Co. v. Fireboard Corp.*, 63 F.R.D. 88, 93 (D. Del. 1974) (cleaned up)); *Morris v. Spectra Energy P'rs (DE) GP, LP*, 2018 WL 2095241, at *2 (Del. Ch. May 7,

9

Although not as clearly stated in Rule 504, the Spousal Privilege has comparable requirements. The easiest is the Confidentiality Requirement. To meet it, the communication must have been made privately and not intended for disclosure to any other person. Next comes the Capacity Requirement. To meet it, the individual asserting the privilege must have both been a spouse *and communicating as a spouse* when the communication took place. The Capacity Requirement dovetails with the Relationship Requirement. The Spousal Privilege does not protect every confidential communication between spouses.[22] The communication must have been from one spouse to another "in furtherance of and in reliance on the marital relationship."[23] That means in furtherance of or in reliance on the private relationship of emotional trust that society associates with a marital relationship and strives to protect. That said, as long as the communication is private, the spouses need not be exhibiting a relationship of emotional trust at the time of the communication, because "the spousal confidential communications privilege is not concerned with protecting *this*

---

2018) ("The attorney-client privilege protects legal advice only; it does not shield business advice."); *In re Estate of Tigani*, 2013 WL 1136994, at *4 n.8 (Del. Ch. Mar. 20, 2013) (explaining that the privilege "does not apply to a communication between attorney and client when the attorney is acting in a non-attorney role").

[22] *E.g.*, D.R.E. 504(e) (identifying types of proceedings where spousal privilege does not apply); Frost, *supra*, at 10–11 (identifying exceptions to the spousal privilege).

[23] Sheffield, *supra*, at 195.

marriage *now* but rather encouraging and protecting marital communication in general."[24] But the spouses must be communicating as spouses.

The Capacity Requirement and the Relationship Requirement operate together to recognize that people have multiple roles. The Spousal Communications Privilege protects communications in the spousal role. Communications between spouses to which no one else is a party are presumptively made in the spousal role and subject to the privilege. One way that a party challenging the Spousal Communications Privilege can defeat its application is to show that the communication was not made in a spousal role.

## B.    Applying The Privilege

Mostaque and Qureshi are spouses, and all of the communications at issue took place during the marriage. But they also occupied important roles at the Company. Mostaque was CEO, and Qureshi was Head of PR and COO. When they communicated privately, they did not only communicate as spouses. Often, they communicated as executives of the Company.

Purely business communications do not warrant protection under the Spousal Communications Privilege. Examples include

> statements about business agreements between the spouses, or about business matters transacted by one spouse as agent for the other, or about property or conveyances. Usually such statements relate to facts that are intended later to become publicly known. To cloak them with

---

[24] *Id.* at 194.

11

> privilege when the transactions come into litigation would be productive of special inconvenience and injustice.[25]

Mostaque and Qureshi communicated privately as executives while running the business, and the Spousal Communications Privilege does not protect those communications.

Unfortunately, there is no easy proxy to determine when Mostaque and Qureshi communicated as executives rather than as spouses. Gone are the days—if ever they existed—when business communications only happened in the office between the hours of 9:00 a.m. and 5:00 p.m. Mostaque and Qureshi communicated by text, and their text strings intermix obvious business communications, obvious spousal communications, and varying degrees in between.

Nor is it possible to adopt a brightline rule to the effect that anything related to the business falls outside the Spousal Communications Privilege. A spouse may come home after a difficult day, share details about what happened, and ask for advice. Just because the spouse is talking about work does not mean that the spouse is not seeking support in furtherance of or in reliance on the private relationship of emotional trust that society associates with a marital relationship and strives to protect. Some of the most important spousal communications involve sharing what

---

[25] 1 McCormick on Evid. § 80 (9th ed.), Westlaw (database updated Feb. 2025) (footnotes omitted).

12

took place after a hard day at work. That remains true even when both spouses are senior corporate officers at the same firm.

To understand the complexity, envision spouses who serve as CEO and CFO of a family-owned company that needs to cut staff:

> CFO Spouse: I'm struggling with whether we let Mike or Amy go. I really like Mike, but every set of forecasts he gives me has mistakes. Amy is stronger, but Mike is more senior.
>
> CEO Spouse: I get it. I hate letting people go. But we should fire Mike. He's not meeting standards.
>
> CFO Spouse: I hate firing people. This is going to be hard. Mike's kid is sick too.
>
> CEO Spouse: I hear you. Get it done and then go home. We should order in. Maybe Thai food?

In this example, the communication has both business and spousal components.

There are at least two factors that can guide a court's analysis of spousal communications. One is whether the communication is uniquely spousal. If non-married corporate spouses could just as easily have had the communication, then it likely reflects their work roles rather than their spousal roles. In the example above, the communication could just as easily happen between startup co-founders who were friends and roommates. A second factor is the emotional valence of the communication. If the emotional valence is low, then it is more likely to reflect work roles rather than spousal roles. In the example above, the communication carries meaningful emotional valance, but not enough to overcome the fact that the communication could have taken place between non-married colleagues.

Applying the Spousal Communications Privilege requires a fact-specific analysis. To counsel's credit, the lawyers addressed the problem constructively. Their agreed-upon approach included sharing documents on a non-waiver, attorney's-eyes-only basis so they could confer about what constituted business communications as opposed to spousal communications. They worked out virtually all of their disputes. In doing so, they upheld the best traditions of the Delaware bar.

What remain are five difficult judgment calls involving mixed communications. For purposes of those communications, the two factors this decision has cited drive the analysis: whether non-spouses could realistically have had the same communication, and the emotional valence of the messages. Other cases may suggest different or additional factors.

Four of the five text strings at issue involve Mostaque and Qureshi speaking primarily as spouses.[26] The communications predominantly concern their private relationship and include sensitive exchanges about their interpersonal dynamic. They are emotionally charged, and the references to business matters are ancillary to the emotional content. The Spousal Communications Privilege protects these exhibits.

---

[26] Using Mostaque's designations, they are Exhibits E, F, G, and H.

One includes a lengthier exchange. [27] In the text strings on the pages designated Stability_048173, Stability_048175, Stability_048176, Stability_048177, and Stability_048178, Mostaque and Qureshi are communicating primarily in a business capacity. They discuss certain employees' attendance at a conference and Qureshi's frustration that Mostaque permitted them to attend the conference without asking her. Qureshi expresses disappointment in the employees' work product and the possibility of making personnel changes if the employees do not improve.

Those are conversations that any two co-workers might have had. Some of the messages reflect frustration, so the emotional valence is higher than professional office communications, but business partners can get frustrated with one another. The level of frustration in the messages reflects that type of emotion. It is also true that one message was sent after 10:30 pm. To reiterate, the workday no longer stops at 5:00 pm. Particularly for executives in a startup, sending a message at 10:30 pm is ordinary course. Mostaque will re-produce those pages with the redactions that Hodes has proposed.

On the remaining pages, Mostaque and Qureshi engage in extended dialog about marital frustrations. The messages are not the types of communications that unmarried co-workers might have and carry a strong emotional valence. They introduce business topics from time to time only in the context of deeper, more

---

[27] Using Mostaque's designations, it is Exhibit D.

15

sensitive disputes. The Spousal Communications Privilege protects those portions of the text string. When Mostaque re-produces the exhibit, the redacted sections on these pages can remain redacted.

### III.  CONCLUSION

Counsel are commended again for their success in managing the difficult issues that this dispute presented. On the limited exhibits where counsel could not agree, Hodes' request for production of anything relating to the business is denied as inconsistent with the scope of Spousal Communications Privilege. Hodes's motion is granted as to the specified portions of one exhibit. Otherwise, the motion is denied.